IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
September 10, 2002 Session

## STATE OF TENNESSEE v. GEORGE GLENN KING, JR.

**Appeal from the Circuit Court for Gibson County**
**No. 15643     L. Terry Lafferty, Senior Judge, by Designation**

---

**No. W2001-02823-CCA-R3-CD - Filed May 15, 2003**

---

The defendant, George Glenn King, Jr., appeals his convictions by a Gibson County Circuit Court jury for first degree murder for which he received an effective sentence of life in prison. He was also convicted of especially aggravated burglary, a Class B felony, for which he received a concurrent sentence of eight years. He contends that he is entitled to a new trial because the state's eliciting expert testimony on the ultimate issue of his insanity and prosecutorial misconduct in closing argument constitute plain error. He also argues that the trial court should have merged his convictions for premeditated and felony murder arising from a single killing. We agree that the defendant's first degree murder convictions should be merged, but we otherwise discern no plain error and affirm the judgments of conviction as modified.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed As Modified; Case Remanded**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which DAVID G. HAYES and JOE G. RILEY, JJ., joined.

Wayne Emmons and Robert C. Brooks, Memphis, Tennessee (on motion for new trial and appeal), and L. L. Harrell, Jr., and Jerald Campbell, Trenton, Tennessee (at trial), for the appellant, George Glenn King, Jr.

Paul G. Summers, Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; Garry G. Brown, District Attorney General; and Hal Dorsey, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

        This case arises out of the August 7, 1998 shooting of the victim, Michael Gardner. Pam Lancaster testified that the victim was a close friend of her and her two sons and that he had lived with them at one point. On the morning of August 7, 1998, the victim was sleeping on her living room couch after staying overnight. She was in her bathroom after 7:00 a.m. when she heard a door

slam, a noise like a firecracker, and a door slam again. She ran to the door, looked out, and saw the defendant in his car backing up. The defendant waved to her as he drove away. One of her sons, who were also sleeping in the living room, said he noticed a strange smell. She looked at the victim and saw blood on the top of his head and coming from his nose. She saw a shell casing on the floor.

On cross-examination, Ms. Lancaster testified that the victim had lived with the defendant at one point and that the defendant had been to her home several times. She denied knowing of any arguments between the defendant and the victim. She said that once the victim came to her house upset saying that the defendant had asked him to start selling drugs for the defendant again and was upset because he had refused. Although she knew that the victim had used drugs in the past, she was surprised to learn that the autopsy revealed the presence of drugs in the victim's body.

Sheriff Joe Shepherd testified that he went to the defendant's home on Narrow Gap Road on August 7, 1998, after receiving a report of the shooting. He said he stopped the defendant about one-half mile from his home about thirty minutes later. He described the defendant as subdued and said the defendant complied with his requests and did not say anything. He said that he saw a gun on the right side of the driver's seat, that it contained .40 caliber shells, and that it was ready to fire.

Deputy Ben Edwards of the Gibson County Sheriff's Department testified that on August 7, 1998, he worked for the Trenton Police Department. He said that he went to Narrow Gap Road and took the defendant into custody from the Sheriff's Department. The sheriff gave him a gun and a magazine. He took a recorded statement from the defendant while en route to the police department. He said that the defendant told him that he had shot the victim once in the top of the head because his niece Teresa Butler had called him around 6:00 or 6:30 a.m. and told him that the victim had raped her. The defendant told him, "No one's going to rape my niece."

On cross-examination, Deputy Edwards described the defendant's demeanor in the patrol car as quiet and cooperative. He said that he read the defendant his rights and that the defendant said he did not want to make a statement. He agreed that en route to the police department, Captain Kimbrough, who was riding with them, asked the defendant what happened, and the defendant started talking. He agreed that when he and Captain Kimbrough were commenting on the heavy rain, the defendant said, "God said it was going to rain hard today." He said that about the time they pulled into the station, the defendant said, "God's work is never done."

Special Agent David Jolley of the Tennessee Bureau of Investigation (TBI) testified that he took a statement from the defendant just after 10:00 a.m. on August 7, 1998. He said the defendant told him that his fourteen-year-old niece called him that morning and told him that the victim had raped her. The defendant said he entered the house where the victim was staying through an unlocked side entrance. The defendant stated that he returned to his car for a flashlight because the house was dark. The defendant said that he went to an L-shaped sectional couch in the living room, two people were sleeping on the couch, and he recognized the victim by his ponytail. The defendant said he shined his flashlight into the victim's eyes to make sure he had the right person. The defendant said he shot the victim in the top of the head, saw the victim jump after the shot, and

watched the victim exhale his last breath. Agent Jolley said the TBI crime lab had determined that the bullet removed from the victim and the casing found at the crime scene were fired from the .40 caliber, semi-automatic Firestar pistol that the sheriff found in the defendant's car.

Agent Jolley testified that the defendant told him that he was afraid the victim was going to do something to him but never gave a reason for this. He said the defendant also told him that the victim had once said he wanted to have sex with the defendant's niece and the defendant's wife. The defendant also reported that the victim owed him $600, part of which was for the defendant's drugs that the victim had been selling. Agent Jolley acknowledged that during the interview, the defendant told him that God was his father, that he was God's son, and that God told him to commit the crime. He said that despite these statements, he believed that the defendant was competent to continue the interview. He described the defendant's demeanor as calm and unemotional. He said the only facial expression the defendant made was to smile when he would mention God. He said the defendant reported smoking part of a marijuana joint earlier that morning but denied that he was high. He said that when he asked the defendant about his mental condition, the defendant insisted that he was sane.

During cross-examination, Agent Jolley read the defendant's statement into evidence. In addition to the above listed details, the defendant repeatedly insisted that God told him to kill the victim. He said he was having problems with his wife and had previously hit her in the mouth and threatened to kill her or their children if she did not admit her crack cocaine problem. He said that the day before the offense, he had talked with his father on the golf course about his marital problems and had consumed three or four swallows of beer at that time. He reported vomiting the evening before the offense because he was cleansing his body. He said that he liked the victim but that God left him no choice but to kill the victim. He said he had seen visions of a silver gun and believed that the victim was going to kill him. He said that the victim owed him $600 and had sold drugs for him, but he denied killing the victim because of this. Instead, he agreed that he committed the offense because of his niece.

In his statement, the defendant said that after shooting the victim, he went to check on his niece and then was going to play golf with his father. He said he did not think the police would find him because God can do anything. He said his father already knew what he had done to the victim because his father told him to do it. He said that his earthly father was God but that he would be God once his father left the earth. He denied knowing that he was going to kill the victim until that morning. He said that he was good, that the victim was evil, that he knew he had done the right thing, and that he had committed the crime for the sake of the world. He said the victim wanted the defendant to kill him or else the victim would not have been asleep. The defendant admitted that he smoked three or four marijuana cigarettes daily. He said that he was "perfectly sane" and was not trying to feign being insane.

Fifteen-year-old Teresa Butler, the defendant's niece by marriage, testified that she knew the victim from seeing him at the defendant's house. She said that she did not call the defendant on the morning of August 7, 1998, and that she did not tell him that the victim had raped her. She said the victim had never made any sexual advances toward her. She said that in July 1998, she and the

defendant had a conversation about sex at his house. She said the defendant had asked her to have sex with him and had shown her that he had some pornographic videotapes and some drugs. She said she had told the defendant that she wanted to remain a virgin. She said he had shown her marijuana on other occasions and had previously invited her to use marijuana and crank with him. She said she had never used drugs with the defendant and had not returned to the defendant's house since the conversation about sex.

Wesley Brasfield, an inmate convicted of aggravated assault and aggravated burglary, testified that he met the defendant in the Gibson County Jail in July 1999, nearly a year after the offenses. He said the defendant told him that he shot the victim because the victim was sleeping with his wife and was about to start sleeping with his niece. He said the defendant told him that he positioned the gun to permit the victim's family to have an open casket funeral. He said the defendant never showed any remorse for the victim's death. He said the defendant told him that the state was seeking the death penalty but that he was trying an insanity plea so that he would not have to spend the rest of his life in prison. Brasfield said that he was getting no benefit from testifying in this case.

On cross-examination, inmate Brasfield testified that he did not witness the defendant's behavior before July 1999. He agreed that the defendant had told him that when the defendant first came to the jail, he smeared feces on his body to keep demons away. He acknowledged that the defendant never said that he was pretending to be crazy but said he believed that this was what the defendant meant. He said the defendant never said anything about the victim raping his niece.

Mike Fowler testified that he was in the Gibson County Jail when they brought in the defendant. Fowler said the defendant smirked and snickered when giving an account of his crimes and told them he was going to plead insanity to get out of it. He said that he and another inmate beat the defendant because he was "laughing about it like he stole a piece of candy," and they did not think it was a laughing matter. He said that he was getting no benefit from his testimony. On cross-examination, he admitted that he had never seen the defendant before that day and did not know the defendant's mannerisms or reactions. He agreed that he did not know if the defendant was mentally incompetent and that the defendant went to the hospital after the beating. He said he served additional time because of the beating.

Dr. William Ward Daniels, Jr., a psychiatrist, testified that he and Dr. John McCoy, a clinical psychologist, examined the defendant for about one hour on October 10, 1998, pursuant to a court order. Based upon their examination, he determined that the defendant was competent to stand trial. He said the defendant's history and the evaluation caused him to conclude that the defendant was suffering from a substance-induced psychosis at the time of the crimes. He explained that a substance-induced psychosis causes the person to lose contact with reality due to mood altering chemicals and was not a severe mental disease or defect in the defendant's case. He said that considering what the defendant told him in the evaluation, the defendant understood at the time of the offenses that what he was doing was wrong.

-4-

On cross-examination, Dr. Daniels testified that although he had read in a transcript that the defendant said he was carrying out a mission from God, the defendant did not tell him this during the interview, which was just over two months after the offenses. He agreed that a professional evaluating the defendant closer in time to the offenses could possibly better evaluate him. He said he had reviewed the records of Dr. Monette and Western Mental Health Institute (WMHI), which were made closer in time to the crimes than his evaluation. He agreed that he was aware that when the defendant was first taken into custody, he claimed he had talked to God and had other hallucinations, had smeared feces on himself to ward off demons, and had reported rarely sleeping and hearing demons screaming at night. He stated that he was also aware that the defendant had been admitted to WMHI for suicidal and bizarre behavior. He agreed that a physician at WMHI had noted that the defendant had a history of hearing voices, believing that he had extrasensory perception, and paranoia dating back several years. He stated that at WMHI, the defendant had been diagnosed with an unspecified psychotic disorder and polysubstance dependence, which is an addiction to three or more substances. He stated that his own evaluation also revealed that the defendant had an unspecified psychotic disorder that involved hallucinations and was probably induced by amphetamines. He said that a person with this diagnosis would experience a loss of contact with reality due to the use of stimulants and might be unable to think logically. He said that with amphetamines, the substance-induced symptoms can last for days or months after the person stops using the drug. He stated that typically, amphetamines leave the user's body within 24 to 48 hours even with prolonged use.

Dr. Daniels testified that testing at WMHI revealed that at the time they saw him, the defendant's global assessment of functioning was at a level of 40, which indicated some impairment in communication, judgment, or thinking. He said that according to the test, the defendant's highest level over the past year was 30, which shows that the subject's behavior is considerably influenced by hallucinations or delusions, a serious impairment in communications or judgment, or the inability to function in almost all areas. He stated that the test identified the defendant's lowest level over the past year as 20, which reveals some danger of hurting himself or others, occasional failure to maintain minimal personal hygiene, or grossly impaired communication. He stated that his own evaluation revealed the defendant's global assessment of functioning to be 45, which would reflect symptoms such as suicidal tendencies, severely obsessive rituals, or any serious impairment in social, occupational, or school functions. He said that he did not disagree with 20 being the defendant's lowest level over the past year.

On redirect examination, Dr. Daniels testified that the defendant had been treated daily with ten milligrams of Haldol, an antipsychotic medication that stops hallucinations and delusions. He described this as a "normal" dosage that could correct psychosis over time. He said that the report from WMHI stated that the defendant's psychotic thoughts and hallucinations cleared within days of starting the Haldol. He stated that this quick result was consistent with a diagnosis of substance-induced psychosis and inconsistent with schizophrenia. He stated that in his professional opinion, the defendant was able to understand what he was doing at the time he shot the victim and that it was wrong. On recross-examination, he agreed that a person suffering from an amphetamine-induced psychosis could believe that they were on a mission from God but he said the defendant never told

him that God told the defendant to kill the victim. He said that at the time of the offenses, the defendant did not believe that he was on a mission from God.

Dr. John W. McCoy, a clinical psychologist at the Cary Counseling Center, testified that he evaluated the defendant on October 10, 1998. He said the defendant told him that before the offenses, he had snorted methamphetamine for eight consecutive days. The defendant said he argued with his wife, who went to stay at her mother's house on either the day before or the day of the crimes. He said he awoke at 5:30 or 6:00 a.m. on the morning of the offenses, smoked one-half of a marijuana joint, walked in the front door of the house where the victim was staying, shot the victim in the head, and left.

Dr. McCoy testified that the defendant gave several different reasons for committing the offenses. He said the defendant told him that he has trouble with his temper and does things while enraged that he later wishes he had not done. He said the defendant reported becoming enraged when his niece called saying that the victim had raped her. Dr. McCoy said the defendant later told him that the story about his niece had always been a "bogus story." He said the defendant also told him that at the time of the crimes, the defendant was still angry with the victim for refusing to leave his house on one occasion. The defendant told Dr. McCoy that he decided to kill the victim because he had remembered that the victim had threatened to kill him at one point. He said the victim owed him $500. The defendant also said that before shooting the victim, he had thought about the victim sleeping with his wife. Dr. McCoy stated that all of these reasons, except the one relating to the defendant's niece, could have played a role in the killing but that the defendant's belief that the victim was sleeping with his wife probably triggered the crimes.

Dr. McCoy testified that he also interviewed the defendant on April 19, 1999, and that he found the defendant competent to stand trial on both October 10 and April 19. He said the defendant's condition was not significantly different on April 19, but the defendant was calmer and more straightforward and truthful. He said he did not believe the insanity defense could be supported because the defendant told him that in the time leading up to the shooting and at the time he shot the victim, he knew it was wrong. He said that the defendant's drug-induced psychosis was not a severe mental disorder. He said that a person using one to two grams of methamphetamine daily would be paranoid, aggressive, and fearful; act strangely; and do things that others would not understand based upon the person's strange inner thoughts and beliefs. In his professional opinion, the defendant knew what he was doing when he shot the victim and that it was wrong.

Dr. McCoy testified that the defendant told him that he had not received any psychiatric treatment before the offenses. Dr. McCoy said that the appearance of a non-substance-induced psychosis such as schizophrenia at the defendant's age would be very rare. He said that amphetamine-induced psychosis is notoriously confused with schizophrenia. He noted that schizophrenics do not show immediate improvement when treated with Haldol but persons with amphetamine-induced psychoses do. He agreed that it was significant that the defendant did not smear feces on himself until after he had been charged with murder. He said that a schizophrenic person would have acted in this way regardless of the charges. Dr. McCoy acknowledged that the

defendant was not thinking well when he committed the crimes and that he may have been delusional. He said that a paranoid schizophrenic in a psychotic state and someone with an amphetamine-induced psychosis would both have inappropriate amounts of emotion and paranoid beliefs that would reach the point of delusions.

The thirty-five-year-old defendant testified that he was a high school graduate and that he and his father had founded King Technologies. He said that although he had been the president of the company and managed daily operations, his father relieved him of his duties and hired someone with a college education. He said that many of his family members worked at King Technologies, that his employment was fraught with family squabbles, and that it had been three and one-half to four years since he last worked there. He said that sometime after he left King Technologies, he became depressed and began smoking marijuana to feel better. He said that six or seven months before the incident, he tried crystal methamphetamine. He said he did not use methamphetamine on a daily basis and never sold drugs, noting that he continued to draw a weekly paycheck of $1600 after he stopped working at King Technologies. He said he sometimes helped friends get drugs as a favor. He said he used methamphetamine six days before he shot the victim. He admitted that he smoked marijuana in the days leading up to the shooting and that he smoked part of a joint on the morning of the incident.

The defendant testified that he and the victim had been friends and that the victim had lived with him for three or four months one year before the shooting. He said he lent the victim money and allowed the victim to have his food whenever the victim was hungry. He said that a couple of weeks before the shooting, the victim came to his house and was flirting with his niece, Teresa Butler. He said the victim liked young girls and had bragged about taking their virginity. He said the victim had told him on previous occasions that the victim could easily get the defendant's niece to have sex with the victim. He said he wanted to take a nap but did not want to go to sleep with the victim around his niece. He said the victim stayed after being asked to leave several times and, ultimately, left only after the defendant screamed at him. He said this was the biggest argument that he and the victim had ever had.

The defendant testified that on the Sunday before the shooting, the victim came to his house and told him that the victim had had a vision of a silver gun. He said the victim was always playing with the defendant's guns and he began to fear that the victim would take one of them. He said he took his guns to his father-in-law's house and had them locked in the gun safe. He said that on Tuesday, he had his wife retrieve his pistol in order for him to lend it to someone but, when that person decided not to use it, he left it in his car. He said that on Thursday, the day before the shooting, something told him to contact his father because something was going to happen to his father. He said he joined his father on the golf course and talked to him about God, the defendant's troubled marriage, and marijuana. He said he believed that he needed to tell his father he loved him. He thought his father's responsibilities would then be placed on him, but he was afraid to tell his father because he thought his father might die after he told him. He said that while there, he drank three or four swallows of a beer and spilled the rest. He said that later that day, he went to Milan to

get some marijuana and became sick and vomited on the way home. He said he awoke after midnight and called his father, who was angry about being awakened.

The defendant testified that on the Friday morning of the offenses, he called his wife and told her that God said that she should come over. He said his wife was angry but agreed to come. He said that in his mind, he believed that God was talking to him. He said he put his golf clubs in the car because he wanted to play golf with his father and talk with him some more. He said that the telephone rang and that he talked to his niece, who said that the victim was raping or had raped her. He said he remembered this as if it had actually happened. He said he went to his niece's house, but she was not there. He drove to Pam Lancaster's house because he thought his niece was with the victim and he knew the victim was there. He said he went to the room where the victim stayed but returned to his car for a flashlight because it was dark. He said that as he reached for his flashlight under the seat, he saw his gun and became frightened that the victim was hurting his niece or would hurt him. He grabbed the gun and the flashlight and returned to the house. He started to leave when he found no one in the victim's room, but he saw the victim lying on the couch. He said all he could think about was his niece screaming. He said that a chill came over him and that he pointed the gun at the victim and pulled the trigger. He said that at the time he was thinking that the victim was evil and that he was suppose to do this. He said he could still hear his niece crying as he left. He said he waived to Ms. Lancaster as he drove away. He said that he went to the victim's house on Gibson Street but could not find his niece there. He said he then went home because he remembered his niece saying that she was with his wife's uncle at the defendant's house.

The defendant testified that the police were at his house when he arrived. He said that his wife began yelling at him for leaving the children alone and that he told her that he had left because the victim had raped their niece. He said the officers arrested him and told him that he had killed the victim. He said he remembered talking about evil and the devil and thinking that the victim's tattoo was the sign of the devil. He said he did not remember referring to God on the way to the police station, but he recalled the officers talking about how hard it was raining. He said he thought that he was the chosen one, that he knew what was going to happen, and that he had made it rain. He said he remembered talking to Agent Jolley about God. He said that while he was interviewed, he began seeing two of everything and believed that he was seeing the good side and the bad side of people. He said that he was still hearing voices and that he had a constant "ringing" in his head. He said that the computer screens in the booking area were "jumping" and talking to him but that he could not understand what they were saying. He said that he felt that he had done what he was suppose to do and did not think that he had done anything wrong.

The defendant testified that while he was in jail, he could not sleep. He said he believed that the victim was the devil, was in a cell near him, and was trying to get him while he was in transition to becoming God. He said he believed that the victim had hypnotized all of the guards and deputies, who were also trying to prevent him from fulfilling his destiny of becoming God. He said he drew crosses and stars of David on his cell walls in order to keep evil people from coming into his cell and wiped all the surfaces of his cell with a shirt soaked in urine in order to keep the demons out. He said he also prayed over his urine and then sprinkled it over the room and himself, thinking it was

holy water. He said he believed that he was disguising himself to prevent the devil from recognizing him. He said he took his clothes off because he believed that he was invisible when he was naked because he was God. He said he spoke with Vice President Al Gore, whom he believed was president, and asked him to send the army to destroy the jail with the devil in it in order to rid the world of evil. He said that he was taken to WMHI where he was finally able to sleep and did not feel as paranoid and scared. He said he was prescribed medication that made him feel a lot better. He said that he use to believe that he could predict the future but that he had not had that feeling while on the medicine.

The defendant denied asking his niece to have sex with him. He said he did have a conversation about sex with her in which she told him that she had never had sex. He said he told her if she decided to have sex, to talk to him first. He said he was concerned about her becoming pregnant while she was still a teenager. He said he told her that if she needed to learn anything about sex, she could watch his pornographic videotapes. He said that he was never alone with his niece and that his wife and children were always there also. He denied offering his niece drugs but said that she might have seen him with drugs. He said that he never thought that the victim was having sex with his wife and that his wife did not like the victim. He said that he and his wife dated other people while they were separated. He said that the victim used drugs and could be violent but that when the defendant was in his right mind, he knew the victim cared about him and his children and was not going to hurt him.

The defendant testified that when he met with Drs. McCoy and Daniels, Dr. McCoy did most of the talking. He said he did talk to Dr. Daniels about God. He said that when he tried to talk to Dr. McCoy about the offenses, Dr. McCoy became angry and called him a liar. He said he told Dr. McCoy that at the time of the interview, he knew the story about his niece was not true but that Dr. McCoy would not let him explain what he thought at the time of the offenses. He said that when Wesley Brasfield asked him why he was in jail, he told him that Dr. McCoy was saying that it was because of drugs and his wife. He said he told Brasfield that he had shot the victim in the head and that the victim had a normal funeral. He denied laughing or snickering when telling inmate Michael Fowler about the offenses and what Dr. McCoy had said about them.

The defendant testified that he killed the victim because he believed the things in his mind were real and that he was doing what God told him to do. He said that at the time he pulled the trigger, he believed that he was killing evil, not the victim. On cross-examination, the defendant said he did not plan to shoot the victim when he went to Ms. Lancaster's house. He said that he was not angry with the victim when he shot him and that the incident concerning the victim not leaving his house was long forgotten. He said he had been depressed for a long time before the offenses and had thought he could predict the future, but he admitted he had never heard voices in his head or engaged in other bizarre behavior before the time of the offenses. He denied using two to three grams of methamphetamine daily. The parties stipulated that the defendant was tested for drugs on August 12, 1998, and that the test was negative for methamphetamine and positive for marijuana.

Rhonda King, the defendant's wife, testified that she and the defendant lost their jobs at King Technologies due to conflicts with his family. She said that after this, she and the defendant fought all the time and were abusive to each other. She said she had never had sexual relations with the victim and that she and the victim did not "get along." She said the victim lived with the defendant while she and the defendant were separated and that she blamed the victim for a substantial part of the problems between her and the defendant. She said that they fought about the victim because the defendant and the victim were "partying" with other women at the house. She said she never saw any problems between the defendant and the victim. She said she did not know when the defendant started using drugs because he hid his drug use from her.

Ms. King testified that following a six-month separation, she returned to their home for two weeks in an attempt to reconcile with the defendant. She said that during this time, her niece Teresa was visiting and went out to the yard with the victim, who had come to get a car part. She said the defendant told her that that was not appropriate and sent her to get Teresa. She said that when the victim came back inside, the defendant asked him to leave, and the victim left. She said that Teresa and the victim were flirting and agreed that she felt uncomfortable with Teresa being around the victim.

Ms. King testified that she and the defendant talked to Teresa about sex and asked her if she was still a virgin. She said that she and Teresa were close and were not uncomfortable having this conversation. She said the defendant did not ask Teresa for sex. She said that they did not mention pornographic videotapes to Teresa but that Teresa knew they had them. She said they asked Teresa to tell them when she decided to become sexually active in order that they could try to dissuade her. She said she was present for the entire conversation with Teresa but agreed there could have been another conversation when she was not there. On cross-examination, she said the defendant showed the pornographic videotapes to Teresa but did not play them. She said that she had talked with Teresa since Teresa had testified in this trial and that Teresa had told her that the defendant never asked Teresa to have sex with him.

Ms. King testified that the weekend before the shooting, she and the defendant had a big argument because the defendant accused her of using crack cocaine. She said that the defendant, who has always had a temper, was physically abusive to her during the argument. She said the defendant brought his guns to her parents' house. She said she did not know of him returning to get one of the guns. She said she and her sister went to the home during the week before the shooting and saw the defendant and the victim laughing and joking together. She said the defendant was behaving normally at this time. She said the defendant had their children on the Thursday before the shooting while she was shopping in Jackson.

Ms. King agreed that the defendant brought the guns to her at her parent's house on the Monday before the shooting. She acknowledged that the defendant made her drink out of the toilet when he beat her on Saturday night. She said that she suspected that the defendant was using drugs but had no proof. She said the defendant called her at 5:30 a.m. and again before 7:00 a.m. on the morning of the shooting. She said that she did not know that he had killed the victim at the time of

the second call and that he asked her to bring him some cigarettes because he had the children. On redirect examination, she said that she did not remember which day the defendant brought the guns to her parents' house.

Cathy Ashley, the defendant's sister-in-law, testified that she accompanied her sister Rhonda King to the defendant's house on the Monday before the shooting. She said the defendant, victim, and her Uncle Mike were working on the defendant's truck. She said they were behaving in a friendly and normal manner.

Diane Hensley, the defendant's sister, testified that she works at King Technologies and that the defendant had left the business one and one-half years before August 7, 1998. She said that before he left, she had noticed some changes in the defendant: He was missing a lot of work, his hygiene had declined, he was constantly nervous, and he would not make eye contact when talking to people. She said that although the defendant had always had an explosive temper, his temper had grown worse over the last couple of years. She noted that on July 25, 1998, he pushed her down in a parking lot. She said that she saw him and his children at her parent's house on the night before the shooting and that he was pacing and seemed nervous and agitated. She said that when she visited him in jail several months after the shooting, he was "wild-eyed" and looked like an animal but that he seemed to be back to normal at the time of the trial.

Joan King, the defendant's mother, testified that starting three or four years earlier, she had noticed changes in the defendant's attitude, personality, and appearance. She said that although he had always had a violent temper, he became more "hotheaded." She said that on the Thursday before the shooting, the defendant called between 4:30 and 5:30 a.m. asking if he could come cook breakfast for them. She said that although the defendant said he was hungry, he did not eat after he cooked breakfast. She said the defendant could not keep still and kept going outside to smoke because she was on oxygen. She said that the defendant called later asking for his father and that she told him that her husband was on the golf course. She said that when she visited the defendant in jail before he went to WMHI, he was saying that he was God and that he or his son would be crowned king, and talking about Vice President Al Gore. She said that he gave his wife a small bag of dried feces as an anniversary gift. She said that since the defendant had returned from WMHI, he had improved and no longer looked wild or talked "out of his head." On cross-examination, she acknowledged that the defendant's behavior when he cooked breakfast on the Thursday before the shooting did not cause her concern. She said she did not remember the defendant being at her house that Thursday night. She said that she had accused the defendant of using drugs but that he had denied it. She said that before the offenses, the defendant had come to her house a few times talking about helicopters flying over the house, causing her to believe that he was on drugs or that something was wrong with him.

George King, the defendant's father, testified that the defendant became president of King Technologies in 1993 and that the defendant's behavior started deteriorating in 1995. He said he hired a new Director of Marketing in 1996, which caused problems with the defendant's wife, who had been in charge of advertisements. He said that at that point, the defendant was still performing

his duties but that his concentration had declined and that he spent more time brooding in his office. He said that the defendant left the business after his wife quit and that during 1997, the defendant no longer worked at King Technologies but lived off the proceeds of the sale of his stock. He said that the defendant, who had always had a bad temper, seemed "more temper prone," and that he could no longer talk to the defendant without the defendant losing his temper. He said the defendant refused his many suggestions to seek help. He said the defendant seemed reclusive in the months leading up to the August 1998 shooting. He said he was present when the defendant pushed the defendant's sister down in the parking lot. He said that he would sometimes feel as if he were in danger when he and the defendant argued but that the defendant never struck him.

Mr. King testified that the defendant called at 4:30 a.m. on the day before the offenses wanting to come prepare breakfast. He said that while the defendant was there, the defendant could not sit down and have a conversation. He said the defendant came to him on the golf course that evening, acting like he was in a rush. He said the defendant rode with him in his cart and told him that he was God and that the defendant was Jesus. He said the defendant was chain smoking and not making sense. He said he stopped by the defendant's house after he played golf and found the defendant playing with his sons and telling them, "Everything's going to be all right." He said the defendant seemed to calm down while he was with his children. He said that the defendant called again at 4:30 a.m. on the day of the shooting and that he asked the defendant to let him sleep. He said he went to work, learned the victim had been shot, and went to the defendant's house. He said the defendant yelled to his wife that he had shot the victim because Teresa called and said she was being raped.

Mr. King testified that he had previously accused the defendant of using drugs but that the defendant had denied it. He said that after the defendant was arrested, he asked the officers to test the defendant for drugs but that to his knowledge, they did not test him. He said that when he saw the defendant four hours after his arrest, the defendant was saying that he was God and Jesus, that he was doing God's work, and that God told him to do it. He said that when he visited the defendant in jail before the defendant went to WMHI, the defendant was "out of it," "wild-eyed," did not make sense, and gave his mother scraps from the floor as gifts. He said the defendant once claimed to be Walt Disney but mostly claimed he was God. He said the defendant professed to get telephone calls in his head and to sense things. He said that after the defendant returned from WMHI, he was almost himself again but that he still talked about getting a telephone call from Teresa before the offenses.

Sergeant J. C. Ward, Gibson County Sheriff's Department jailer, testified that the defendant behaved normally during his first week at the jail. He said that he checked on the jail's inmates hourly at night and that one night when he checked on the defendant, feces were all over the defendant, the wall, and the floor. He said he noticed no other bizarre behavior from the defendant other than this incident and that he did not notice much difference in the defendant's behavior after he returned from WMHI. Sergeant Charles McLin of the Gibson County Sheriff's Department also testified that on one occasion before the defendant went to WMHI, the defendant had feces all over his body. He said aside from this incident, the defendant behaved normally.

Lieutenant Jimmy Hand of the Gibson County Sheriff's Department testified that he occasionally noticed that the defendant was dirty while in jail. He said that once while the defendant was in seclusion at the jail, he attempted to quiet the defendant who was being loud. He said the defendant claimed he was talking to God and to his grandfather, and he agreed the defendant seemed anxious as if coming down off drugs. Lieutenant Hand said he later learned that the defendant's grandfather was deceased. On cross-examination, he agreed that it was not unusual for prisoners to be dirty or loud.

Deputy Jailer Austin Fred Little of the Gibson County Sheriff's Department testified that he once saw that the defendant had smeared feces on himself. He noted that the defendant's clothes were taken away from him because other officers said he was trying to hurt himself. He said the defendant once grabbed a pitcher of tea from a kitchen worker and threw it on Deputy Little when he told the defendant he did not need the entire pitcher. He said that once the defendant returned from WMHI, the defendant was a different person and caused no problems.

Dr. Gerard Monette, a psychiatrist, testified that he examined the defendant at the jail on August 24 and 31, 1998. He said that on the 24th, the defendant was naked, distraught, mentally disorganized, and being kept in seclusion for his own safety. He said he attempted to test the defendant but the defendant, who had a headache and blurry vision, was untestable. He said the defendant had an obvious thought disorder and made frequent requests for tea. He said the defendant said he had seen thousands of spiders in his jail cell and that he would urinate on them. He said that he spent four to five hours with the defendant and that three hours of examination is usually sufficient for a forensic evaluation. He said he returned on the 31st and found the defendant clothed but disheveled and dirty. He said the defendant said that he got the ability to hear people screaming for help from miles away from his grandfather and that his life's mission was rescuing these people. He said the defendant reported being persecuted in jail and seemed obsessed with drinking tea. He said that he signed the form committing the defendant to WMHI after speaking with jailers who were concerned with the defendant's suicide attempts. He said the defendant told him that he planned to commit suicide with an extension cord, and he said he saw an extension cord in the defendant's cell.

Dr. Monette testified that based upon his examination of the defendant, the history he got from the defendant's parents, and the defendant's stress while being tested, he concluded that the defendant had paranoid schizophrenia, which is a severe mental disease. He stated that the defendant's schizophrenia started in 1996, that he had this disease at the time of the crimes, and that it was exacerbated by his use of methamphetamine. He said that at the time of the shooting, the defendant had acute symptoms of schizophrenia and that his actions were determined by auditory hallucinations. He said that at the time of the offenses, the defendant had substantial problems in understanding what he was doing and did not think it was wrong. He agreed that the defendant could have believed that he was on a mission from God and involved in a battle between good and evil. He said the feeling that one understands everything is typical of schizophrenics.

Dr. Monette testified that methamphetamine can cause a syndrome that is indistinguishable from paranoid schizophrenia. He said that with paranoid schizophrenia, the individual's

hallucinations are primarily auditory but that, with amphetamine-induced psychosis, they are usually visual. Dr. Monette said that the telephone call from the defendant's niece and the calls for help from others were hallucinations but were real to the defendant. He disagreed with Dr. Watford that the defendant had a bipolar disorder because the defendant had reported no manic attacks in the two years preceding the offenses. He said that Dr. Watson could have interpreted the defendant's episode of euphoria while at WMHI and his post-psychotic episode of depression as part of a bipolar spectrum but that this was contradicted by the defendant's two-year history of deteriorating behavior. He said that the defendant was treated with ten milligrams of Haldol, which is a high dose for serious psychotic symptoms. He said that an acutely psychotic individual who was not exhibiting much agitation could reasonably be expected to have some improvement after four to five days of treatment with Haldol.

Dr. Monette testified he examined the defendant on March 10, 1999, after the defendant had been to WMHI and received treatment. He said that the defendant's hygiene was poor and that he appeared exhausted and withdrawn. He said the defendant talked again of committing suicide with an extension cord, said the guards had "maced" and beaten him, and then laughed inappropriately. He said the length of time between his questions and the defendant's answers indicated that the defendant could not put his thoughts together. He said the defendant repeated that he believed in his telepathic abilities and that his niece had called on the morning of the offenses saying that she had been raped. He said the defendant still believed that he had received a telephone call from his niece even though he was now ashamed about the events involving his excrement while in jail, which the defendant attributed to being "nuts in the head." He said the fact that the defendant still believed that the telephone call and his telepathic powers were real despite six months of treatment with Haldol showed that the defendant suffered from paranoid schizophrenia rather than a drug-induced psychosis. He said that with an amphetamine-induced psychosis, the person realizes that the hallucinations were not real once the drugs disappear from their system, which takes about five days. He said that after performing an algorithmic analysis of all of his data on the defendant, he was 95% certain that the defendant had paranoid schizophrenia. He said that his deception analysis of this data revealed that the defendant was not malingering.

On cross-examination, Dr. Monette testified that the defendant told him that on the morning of the offenses, his niece telephoned him screaming, crying, and pleading for the defendant to help her because the victim had raped her and was trying to kill her. He said the defendant told him that the victim was evil and that when he went into the place where the victim was staying, the defendant saw the victim on top of his niece who was in a pool of blood and was screaming. He said the defendant related that the victim was raping and probably killing his niece, that he emptied his gun into the victim who kept coming toward him, and that he left after the victim had finally died. Dr. Monette agreed it was possible for a person to believe they were on a mission from God and still intend their actions. He said the defendant told him that he thought he was in a movie while committing the offenses. He concluded that because the defendant believed he was acting in a movie when he set out for the victim's house, the defendant did not believe what he was doing was wrong. He said that based upon his examinations of the defendant, the defendant never had any command hallucinations or heard God commanding him. He said that the defendant told him that the

-14-

defendant, his wife, and the victim had engaged in consensual sex together. He said he believed that the diagnoses of Drs. Daniels, McCoy, and Watford agreed with his diagnosis for the most part. He said that Dr. McCoy's report reflected that Dr. McCoy had suggested that the account involving the defendant's niece was false and that the defendant had agreed because he was susceptible to suggestion.

Dr. Dale Michael Watford, a physician, testified that his area of expertise was the medical treatment of psychiatric patients. He said that he treated the defendant on August 31, 1998, when he was working as the General Medical Officer at WMHI. He said the Gibson County Sheriff's Department brought the defendant to WMHI because of his unusual behavior while confined. He stated that he took the defendant's history, which showed that the defendant had been exhibiting bizarre behavior and delusional thought processes, threatening suicide, and smearing feces on his body with some religious preoccupation. He said he believed that the defendant met the criterion for admission to WMHI because he was a danger to himself or others or was out of contact with reality. He said he treated the defendant with Haldol, giving the maximum starting dosage of ten milligrams daily. He said that based upon recent studies, patients who respond to Haldol will do so fairly rapidly.

Dr. Watford testified that he initially diagnosed the defendant with a bipolar disorder with psychotic features but his diagnosis changed to an unspecified psychotic disorder. He said a patient's global assessment of functioning (GAF) reflects how the practitioner feels the patient will function in everyday living. He said a GAF of 40 is the cutoff limit for discharging a patient. He stated that a person with a GAF of 20 would have problems that were overtly obvious to a layperson, such as not grooming oneself, talking to oneself, or believing that one had special powers. He said that the defendant remained at WMHI for about ten days and that a practitioner would need a minimum of two to three weeks to observe a patient before making an accurate diagnosis. He stated that he did not believe that the defendant was a paranoid schizophrenic. On cross-examination, he initially testified that he did not come to a conclusion about whether the defendant was insane at the time he examined him. He said that he could not say that the defendant was "floridly psychotic" and that the defendant had a moderate, rather than a severe, mental disease. On redirect examination, he said that he had no opinion about whether the defendant was able to appreciate the wrongfulness of his conduct at the time of the crimes and that he did not examine the defendant to determine this.

Based upon this evidence, the jury found the defendant guilty of premeditated murder, felony murder, and especially aggravated burglary. He attacks only the first degree murder convictions in this appeal.

## I. ADMISSIBILITY OF EXPERT TESTIMONY ON ULTIMATE ISSUE

The defendant contends that the trial court erroneously permitted the state to question the expert witnesses on the ultimate issue of the defendant's sanity in violation of Tenn. Code Ann. § 39-11-501(c). That section provides that "[n]o expert witness may testify as to whether the defendant was or was not insane . . . . Such ultimate issue is a matter for the trier of fact alone."

Tenn. Code Ann. § 39-11-501(c). He acknowledges that he did not object at trial but argues that the admission of this testimony constituted plain error that affected his substantial rights because the only issue in this case was his insanity. He asserts that the state compounded the error by arguing to the jury that experts had not found the defendant to be insane and by improperly bolstering the testimony of its expert Dr. McCoy. The state contends that the defendant's issues are waived due to the untimely filing of his motion for a new trial. It also argues that any error in admitting the testimony in question is not plain but harmless. We conclude that the testimony in question is not plain error.

Specifically, the defendant contends that the state improperly asked Dr. John McCoy and Dr. Dale Michael Watford for their opinions about whether the defendant was insane at the time of the offenses. The defendant points to the following direct examination of Dr. McCoy as the state improperly eliciting expert opinion on the ultimate issue of the defendant's sanity:

> Q. With regard to whether or not he was competent – is competent to stand trial, do you have an opinion about that?
>
> . . . .
>
> A. He's – was certainly competent to stand trial on both occasions that I saw him.
>
> Q. And what about the question, can the defense of insanity be supported?
>
> A. Well, I don't believe that it can be supported for several reasons. The law requires certain criteria to be met. It requires a severe mental disorder which caused the defendant to be unable to appreciate the wrongfulness of the acts constituting the crime – the alleged crime. The defendant convinced me and told me that he knew it was wrong to shoot this man in the head, that he knew that at the time he shot him, and he knew it leading up to when he shot the man, and that he knew that was wrong. So, that knocks out one of the requirements.
>
> The law says that states that are caused by intoxication on alcohol or drugs do not count as the severe mental disorder part of the requirement. So, the defendant met every requirement for a drug induced psychosis, specifically for an amphetamine psychosis. . . . [I]t was my belief that he did not have the required severe mental disorder other than an alcohol and drug disorder.
>
> Q. But even if he did – . . . . Your professional opinion is –

A. He said – my opinion is that he knew it was wrong, and he did it anyway.

The defendant argues that the state also improperly cross-examined Dr. Watford on his opinion about whether the defendant was insane:

Q. And Mr. – you've used the word "crazy." Is that a psychological term?

A. No, sir. I was trying to – [defense counsel] asked for laymen terms. No, sir. I could have expounded with a lot of big words if you'd like me to.

Q. Sure. Is it a legal term? It's not a legal term either, is it?

A. I wouldn't know.

Q. Is "insane" a legal term?

A. I don't know about "insane." "Insanity" is a legal – probably a legal condition. There are legal conditions that indicate insanity.

Q. Dr. Watford, [defense counsel] asked you whether or not he was insane, and your response, if I remember correctly, was that in your opinion – in your professional opinion he met the criteria for retention.

A. Yes, sir. That's exactly right.

Q. Now, the fact is your examination showed that he was not insane, did it not?

A. My evaluation indicated that the patient had problems that indicated further study, sir. I didn't – I don't think I came to a conclusion one way or the other on insanity.

Q. Well, the fact is, if you look at your report . . . it's obvious that he wasn't insane, isn't it?

A. It wasn't obvious to me, sir. To me, it indicated that the person – that the patient needed to be retained for further study.

. . . .

-17-

Q. Okay. Let me ask you again, Dr. Watford, and I'm not trying to . . . argue with you. But as you understand the term "insanity," he was not insane, was he?

A. No, sir. No. I can't say that he was – floridly psychotic – I take "insane" to mean floridly psychotic. Now, can we agree on that?

Q. We – you can say it any way you want to.

A. Okay. Mental illness – insanity has varying degrees of presentation. It's not an if or an absolute law. It's not black and white or up and down. It's the whole spectrum of the ladder. There's rungs on a ladder there.

. . . .

Q. We had a little trouble agreeing or perhaps understanding what insanity is. Did he have a severe mental disease when you saw him?

A. No, sir.

Q. Did he have a –

A. Not a severe. No, sir.

Q. Not severe?

A. Moderate.

The state contends that Dr. McCoy spoke in terms of whether there was support for the insanity defense in the context of whether the defendant was competent to stand trial. It argues that Dr. Watford testified that he could not determine whether the defendant was insane. Thus, it concludes that even if the questions put to Drs. McCoy and Watford were improper, neither gave testimony on the ultimate issue of the defendant's insanity.

The defendant argues that the state compounded the erroneous admission of expert testimony on his insanity by referring to it in closing argument. He asserts that the following portion of the state's closing argument heightened the prejudicial impact of the improper testimony:

You heard Dr. McCoy and you heard Dr. Daniels both say, "this man knew what he was doing; this man knew that what he was doing was wrong; this man was not legally insane." You heard the Defendant's

-18-

own witness, Dr. Watford say, I can't say he was legally insane." I didn't even ask the question.

He also contends that the state improperly bolstered the credibility of Dr. McCoy by arguing that the jury and the trial judge had "never heard [an expert witness] more knowledgeable, more articulate or who knew more about what he was talking about." He argues that the state's eliciting improper testimony on the only controverted issue in the case and emphasizing that testimony during its closing argument foreclosed the possibility of a reliable verdict, thereby affecting his substantial rights.

In the present case, the defendant's motion for a new trial was untimely. Normally, only issues which would result in a dismissal, rather than a new trial, may be considered when the motion for new trial is filed late because all other issues contained in the motion are considered waived. See T.R.A.P. 3(e); State v. Givhan, 616 S.W.2d 612, 613 (Tenn. Crim. App. 1980). On the other hand, pursuant to Rule 52(b), Tenn. R. Crim. P., we have the discretion to notice an error that has affected the substantial rights of an accused when necessary to do substantial justice. The following factors should be considered in determining the existence of plain error:

> "(a) the record must clearly establish what occurred in the trial court;
>
> (b) a clear and unequivocal rule of law must have been breached;
>
> (c) a substantial right of the accused must have been adversely affected;
>
> (d) the accused did not waive the issue for tactical reasons; and
>
> (e) consideration of the error is 'necessary to do substantial justice.'"

State v. Smith, 24 S.W.3d 274, 282-83 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App.1994)). As noted in Adkisson, "recognition should be limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." 899 S.W.2d at 642.

After careful review of the record in the present case, we cannot say that plain error is evident with regard to the admission of expert testimony. The defendant did not object to the questioning he now challenges on appeal. Additionally, we note that Dr. Watford's challenged testimony relates to whether the defendant was insane at the time Dr. Watford examined him at WMHI over three weeks after the crimes. Even assuming the challenged testimony was improper, we do not view these brief references to have had a prejudicial impact upon the trial in light of the extensive testimony of four mental health experts that collectively spans over two hundred pages of transcript from this three-day trial. Over half of this testimony was given by the defendant's expert, Dr. Gerard Monette, who exhaustively presented the defendant's theory that he suffered from the severe mental

disease of paranoid schizophrenia and, as a result, could not appreciate the wrongfulness of his actions in killing the victim. The defendant's substantial rights were not affected by the admission of this testimony.

## II.  PROSECUTORIAL MISCONDUCT

The defendant contends that the state committed prosecutorial misconduct during closing argument. The state responds that the defendant has failed to show any error rising to the level of reversible, plain error. We agree with the state that the record does not contain plain error.

Again, we note that the defendant failed to object to the state's closing argument at trial and untimely filed his motion for a new trial. As such, he has waived our review of this issue, subject to our noticing plain error. See T.R.A.P. 3(e) (providing that misconduct of the parties in a jury trial not raised in a motion for new trial will be treated as waived on appeal), 36(a) (providing that relief is not required for a party who failed to take reasonably available action to prevent or nullify an error); State v. Little, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992) (holding that the defendant's failure to object to the state's alleged misconduct during closing argument waives that issue).

The defendant asserts that the prosecutor called the defendant arrogant and insulting during the closing argument:

> In his testimony yesterday, the Defendant arrogantly explained away this heinous act by attempting to convince you that he thought Michael was the devil. I submit to you that this explanation was an insult to you, an insult to the people of the State of Tennessee, but most of all, an insult to Michael Gardner.

He also maintains that the prosecutor improperly called the defendant a "spoiled brat" during the state's rebuttal argument:

> Yeah, I'll tell you what's wrong in his head. He's a 35 year old and by the way, 35 is not young. 19, the age of young Michael Gardner when the Defendant murdered him, that's young. He's a 35 year old spoiled brat who wants to blame every bad thing he's done in his life on somebody else.

It is improper for the prosecutor to use epithets to characterize the defendant. State v. Cauthern, 967 S.W.2d 967 S.W.2d 726, 737 (Tenn. 1998) (calling the defendant the "evil one"); see, e.g., State v. Bates, 804 S.W.2d 868, 881 (Tenn. 1991) (calling the defendant a "rabid dog" is patently improper); State v. Joel Guilds, No. 01C01-9804-CC-00182, Williamson County, slip op. at 11 (Tenn Crim. App. May 27, 1999), app. denied (Tenn. Nov. 22, 1999) (referring to the defendant as "this clown" improper). Here, the prosecutor describes the defendant's demeanor during his

testimony as arrogant and his explanation of his behavior as insulting. The defendant's credibility was an issue at trial, in particular with respect to whether he was malingering in his insanity defense. These comments were not improper.

This court has held that calling the defendant a "liar" is "rarely to the benefit or the dignity of the state . . . even if the proof supports such a conclusion." State v. Jody Sweat, No. E2000-02472-CCA-R3-CD, Sevier County, slip op. at 11 (Tenn. Crim. App. Sept. 26, 2001). We believe that calling the present defendant a "spoiled brat" is of similar ilk, even though the evidence contains some basis for such a description of the defendant.

The defendant argues that the prosecutor indirectly accused defense counsel of being a spoiled brat when the prosecutor said that defense counsel had blamed others for the defendant's actions just like the defendant: "It's always somebody else's fault, and, you know, that condition of blaming somebody else must be catching because his lawyer has done it all afternoon." Reading this passage in context, we do not believe the prosecutor is accusing defense counsel of being a spoiled brat. The comment that defense counsel, like the defendant, is blaming others made the point that the defense is one of shifting blame.

The defendant also contends that the prosecutor impugned defense counsel's representation of the defendant by implying that defense counsel knew the insanity defense was contrived and noting that defense counsel could not understand a legal term. In concluding his initial closing argument, the prosecutor argued:

> Ladies and Gentlemen, I will leave you with one final thought. Very early on in this trial Mr. Harrell cross examined the State's first witness, Ms. Pam Lancaster. His final question was given in the form of a statement. Mr. Harrell said, "Miss Lancaster, when Glenn left the scene, he was driving normal." Even his own lawyer knows.

Although pointing out that the defendant did not begin acting strangely until sometime later on the morning of the offenses is valid, implying that defense counsel disbelieved the insanity defense is questionable. We note, though, that the defendant thoroughly countered this argument in his own closing, arguing that the defendant's behaving as though nothing unusual had occurred within minutes of shooting someone was abnormal.

In his rebuttal argument, the prosecutor marshalled the evidence on the events of the killing itself, including the defendant's return to his car for a flashlight, and then argued that this evidence showed premeditation:

> We know that his act in shooting him was a willful act. We know that it was a deliberate act. We know that it was an intentional act and we know in spite of Mr. Harrell's difficulty in understanding the concept, we know that it was a premeditated act. The only question

is whether or not Mr. Harrell and Mr. Campbell have convinced you that the Defendant was legally insane at the time he committed this murder.

The supreme court has held that a prosecutor's insulting remark that he would have to explain something to defense counsel was improper and in combination with other prosecutorial misconduct warranted a new trial. State v. Hicks, 618 S.W.2d 510, 519 (Tenn. 1981). On the other hand, in this case, we believe that the prosecutor's statement about defense counsel's difficulty in understanding the concept of an intentional act is a reference to the defense counsel's arguing that even if the jury rejected the insanity defense, the defendant did not have the mental state to commit first degree murder.

The defendant contends that the prosecutor improperly argued that Dr. Monette neither knew the facts of the case nor knew that the defendant had testified at length about his hallucinations and delusions. He claims this argument was improper because the state was responsible for having Dr. Monette excluded from the courtroom during the defendant's testimony over the defendant's objection. He also asserts that the prosecutor improperly characterized Dr. Monette as dishonest by saying that he did not care about the facts, comparing him to the Queen of Hearts from Alice in Wonderland and suggesting that he deliberately failed to include certain facts in his report. After noting the absence of any evidence that the defendant had attempted, as opposed to threatened, suicide while in jail, the prosecutor argued as follows:

> It's a big difference in a suicide threat and a suicide attempt. He didn't know the facts and he didn't care about the facts. Who was it – the Queen of Hearts in Alice in Wonderland? Verdict first; evidence later. Isn't that the way Dr. Monette approached this case?

The state's argument about the exclusion of facts relates to Dr. Monette's failure to say anything about the defendant telling him that the defendant, the victim, and the defendant's wife had engaged in a threesome: "Dr. Monette also felt that it was prudent to leave out of his evaluation that the Defendant told him about engaging in three-way sex with his wife and Michael."

Reading these arguments in context, they relate to the state's point that Dr. Monette's opinion was unreliable because the defendant gave him a different version of the events of the crime. It also suggests that Dr. Monette did not explore the facts forming the bases of his opinions, i.e., the suicide attempts. Finally, the comment about Dr. Monette not knowing that the defendant had testified at length was set in contrast to Dr. Monette's testimony that paranoid schizophrenics are reluctant to talk about their hallucinations. Neither these arguments nor the illustrative literary reference are improper. See, e.g., Niebur v. Town of Cicero, 212 F. Supp. 2d 790, 807 (N.D. Ill. 2002) (Plaintiff's referring to defense witness as Queen of Hearts in closing argument was not improper).

The defendant characterizes the following argument as the prosecutor insulting Dr. Monette's French Canadian ancestry and accent:

He tells Dr. Monette, "I received a telepathic message from Teresa that she was in trouble and I had to go and get her out of trouble," but then, and maybe you understood Dr. Monette better than I did. At some point the story segued and I don't know whether it was Dr. Monette's story or Mr. King's. There's a segue to "it wasn't really me. It was a movie."

This argument in context referred to a confusing part of Dr. Monette's testimony, in which he repeated that the defendant told him that the defendant killed the victim in order to save his niece and then, for the first time on cross-examination, said that the defendant told him that the defendant believed he was in a movie. It was not a reference to his ethnic origin or accent. Instead, it was defense counsel who commented in closing argument upon Dr. Monette's ethnicity, saying that Dr. Monette "is a Canadian" and "does not always speak the way we do."

The defendant contends that the prosecutor characterized the defense as nothing more than "word games" in the following argument: "Aren't you tired of all these word games? Isn't it time to start calling things what they really are?" We take this to be a comment upon the insanity defense. It is part of the prosecutor's job to argue the weakness in the defense. This argument was not improper.

The defendant points to three portions of the state's closing argument in which he contends that the prosecutor improperly bolstered its own witnesses. The first involves the portion of the state's closing mentioned in Issue I in which the prosecutor stated that neither the jury nor the trial judge have heard a more knowledgeable or articulate witness than Dr. McCoy: "You heard Dr. McCoy and you probably never heard an expert witness and probably nobody in this Courtroom including the Judge who has heard a bunch of them – you've probably never heard one more knowledgeable, more articulate or who knew more about what he was talking about." In the second, after discussing the testimony of the defense experts, the prosecutor said, "The State's doctors, on the other hand, namely Dr. McCoy and Dr. Daniels, were obviously men of intelligence that were obviously men of integrity," whose reports were consistent with each other and common sense. In the third, the prosecutor stated that "Joe Shepherd, one of the most outstanding law enforcement officers, recognized as such in the State of Tennessee," took the defendant into custody within an hour of the offenses and reported that the defendant was behaving normally.

In State v. Thornton, this court held that the state's comment that the crime laboratory does an excellent job was improper but harmless:

> It is a violation of the Code of Professional Responsibility, DR 7-106(C)(4) for lawyers engaged in trial to express their personal opinion about any issue involved in the justice of the cause they represent. See State v. Hall, 976 S.W.2d 121 (Tenn. 1998). Certainly, a lawyer should not assert his or her personal opinion as to the credibility of a witness, or as to the accused's guilt or innocence.

-23-

> State v. Henley, 774 S.W.2d 908, 911 (Tenn. 1989). Whether a statement qualifies as misconduct often depends upon the specific terminology used. United States v. Stulga, 584 F.2d 142, 147 (6th Cir. 1978) (stating "The use of the words '[I] submit' are not the equivalent of expressing [a personal] opinion."). In this case, the prosecuting attorney essentially vouched for the effectiveness of the crime lab, stating that he was "very proud of our crime lab." He further stated that "[t]hey do an excellent job." There were no prefatory words, such as 'submit,' or qualifying terms, such as "In my view." Rather, the statement that the crime lab does "an excellent job," qualified as a personal opinion made before the jury and in contravention of the rule.

10 S.W.3d 229, 235 (Tenn. Crim. App. 1999). Similarly, the challenged statements in the present case were not preceded by prefatory words and constituted the prosecutor's personal opinion. Such argument was improper.

The defendant argues that the prosecutor improperly inserted his personal opinion into the argument by arguing "[t]here's not a person within the sound of my voice who believes that that incident [the sex conversation], that encounter didn't happen just like Teresa Butler said it did", "I thought it was highly coincidental that all of this behavior occurred after the Defendant was charged", and "[w]e know that his act in shooting him" was willful and deliberate. A prosecutor may properly base his or her argument upon inferences supported by evidence in the record, including argument pertaining to the veracity of a witness's testimony. See State v. Brown, 836 S.W.2d 530, 552 (Tenn. 1992); State v. Beasley, 536 S.W.2d 328, 330 (Tenn. 1976). Although a prosecutor is prohibited from expressing a personal opinion on a witness's credibility, he or she may argue based upon an analysis of the evidence and the conclusion supported by the evidence. See Tenn. S. Ct. R. 8, DR 7-106(C)(4). Here, the first statement was the prosecutor arguing that the jury should believe Teresa Butler over the defendant's and his wife's account of the conversation about sex. It is in response to the defendant's argument that Ms. Butler likely misconstrued the defendant's attempts to counsel her about sex as a request that she have sex with him. With regard to the second statement, Dr. McCoy testified that a paranoid schizophrenic would have been engaging in bizarre behaviors before and after the charges, rather than solely after the charge. Although the prosecutor couched this statement in terms of his thoughts on the matter, the implication that the defendant is malingering has a basis in the record. Finally, the prosecutor's statements regarding the defendant's mental state at the time of the offenses follows his pointing out that the defendant returned to his car to acquire a flashlight and shined it on the victim to make sure he had the right person. Although the prosecutor said "[w]e know," in essence, he is saying that the jury can be sure of the defendant's mental state because of the defendant's actions.

Finally, the defendant contends that the prosecutor improperly invoked the victim's memory as a reason to convict by arguing the following to conclude his rebuttal argument:

Aren't you tired of all these word games? Isn't it time to start calling things what they really are? Hasn't the family of Michael Gardner suffered far too much already? Don't add to the injustice that has already been perpetrated against them by letting this man get away with murder. Don't denigrate his life – the life of their son by calling this crime anything but what it is. Honor his memory and do justice to yourself and justice to this county by calling this killing just what it was, a cold blooded calculated, deliberate, premeditated Murder in the First Degree and I thank you.

The state "may risk reversal by engaging in argument which appeals to the emotions and sympathies of the jury," rather than counseling "jurors to base their decision upon a reasoned moral response to the evidence." State v. Cribbs, 967 S.W.2d 773, 786 (Tenn. 1998) (holding that the state's argument that victim's four-year-old daughter had lost her mother was not so inflammatory that it more likely than not affected the verdict to the defendant's prejudice in light of fact that it was based on evidence in record and meant to contradict the defense argument that a sentence of life was the same as a death sentence). Although this appeal to sympathy was improper, it was not lengthy and might have been, in part, a response to defense counsel's asking the jurors to give the case "due consideration as if the Defendant was a loved one, a member of your family and to treat him as you would hope they would be."

As noted, many of the prosecutor's arguments raised by the defendant do not constitute error. As for the prosecutor's referring to the defendant as a "spoiled brat," stating his personal opinion about the credibility of the state's witnesses, and invoking the victim's memory, we conclude that they do not rise to the level of plain error in light of the trial court's instruction that the parties' arguments were not evidence and the great weight of evidence against the defendant. The defendant is not entitled to relief on this issue.

### III.  MERGER

The defendant contends and the state concedes that the trial court should have merged the defendant's two convictions for first degree murder arising out of a single killing. Our supreme court has directed that when a defendant is charged with both premeditated and felony murder, the trial court should instruct the jury to render a verdict on both theories of first degree murder. State v. Howard, 30 S.W.3d 271, 275 (Tenn. 2000). Yet, "when only one person has been murdered, a jury verdict of guilt on more than one count of an indictment charging different means of committing first degree murder will support only one judgment of conviction of first degree murder." State v. Cribbs, 967 S.W.2d 773, 788 (Tenn. 1998). Thus, the trial court should have merged the jury's verdicts of guilt on both premeditated and felony murder into a single judgment of conviction. See Howard, 30 S.W.3d at 275; State v. Addison, 973 S.W.2d 260, 267 (Tenn. Crim. App. 1997). The merger avoids a double jeopardy problem while protecting the jury's findings. Howard, 30 S.W.3d at 275. We modify the judgments of the trial court to merge count two, the felony murder

conviction, into count one, the premeditated murder conviction, and direct the trial court to enter a single judgment of conviction for first degree murder.

Finally, the defendant contends that the cumulative effect of the error in the violation of the ultimate issue rule and prosecutorial misconduct in closing argument warrant a new trial. Having reviewed the record with regard to these contentions, our consideration of them collectively likewise does not uncover plain error. Based upon the foregoing and the record as a whole, we affirm the judgments of conviction as modified and remand the case for entry of a single judgment for first degree murder.

_____
JOSEPH M. TIPTON, JUDGE